UNITED STATES of America, Plaintiff,

ex rel. TAXPAYERS AGAINST FRAUD and Chester L. Walsh, Plaintiffs–Appellees,

v.

GENERAL ELECTRIC COMPANY, Defendant–Appellant.

Nos. 92–4283, 93–3015.

United States Court of Appeals, Sixth Circuit.

Argued March 11, 1994.

Decided Nov. 30, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 18, 1995.

John W. Beatty (briefed), Dinsmore & Shohl, Cincinnati, OH, Roger M. Witten (briefed), Louis R. Cohen (argued), Wilmer, Cutler & Pickering, Washington, DC, for General Elec. Co. in No. 93–3015.

Before: MERRITT, Chief Judge; and NELSON and BOGGS, Circuit Judges.

Ann Lugbill, James B. Helmer, Jr., Robert C. Neff, Jr., Helmer, Lugbill, Martins & Neff, Cincinnati, OH, Robert E. Montgomery, Jr. (argued), Paul, Weiss, Rifkind, Wharton & Garrison, Washington, DC, John R. Phillips, Lauren K. Saunders, Mary L. Cohen (briefed), Hall & Phillips, Los Angeles, CA, for Taxpayers Against Fraud in No. 92–4283.

Ann Lugbill, James B. Helmer, Jr., Robert C. Neff, Jr., Helmer, Lugbill, Martins & Neff, Cincinnati, OH, Robert E. Montgomery, Jr. (argued), Paul, Weiss, Rifkind, Wharton & Garrison, Washington, DC, Paul R. Hoeber, Marron, Reid & Sheehy, San Francisco, CA, for Chester L. Walsh in No. 92–4283.

John D. Luken, John W. Beatty (briefed), Dinsmore & Shohl, Cincinnati, OH, Roger M. Witten (briefed), Andrew N. Vollmer, Simone R.D. Francis, Jane G. Sherburne, Louis R. Cohen (argued), Wilmer, Cutler & Pickering, Washington, DC, for General Elec. Co. in No. 92–4283.

Michael Davidson (briefed), Morgan J. Frankel (argued), Washington, DC, for amicus curiae U.S. Senate.

James B. Helmer, Jr., Helmer, Lugbill, Martins & Neff, Cincinnati, OH, Robert E. Montgomery, Jr. (argued), Paul, Weiss, Rifkind, Wharton & Garrison, Washington, DC, John R. Phillips, Lauren K. Saunders, Mary L. Cohen (briefed), Hall & Phillips, Los Angeles, CA, for Taxpayers Against Fraud in No. 93–3015.

James B. Helmer, Jr., Helmer, Lugbill, Martins & Neff, Cincinnati, OH, John R. Phillips, Lauren K. Saunders, Mary L. Cohen (briefed), Hall & Phillips, Los Angeles, CA, for Chester L. Walsh in No. 93–3015.

BOGGS, J., delivered the opinion of the court, in which MERRITT, C.J., joined. NELSON, J. (p. 1050), delivered a separate opinion concurring in the judgment and in all but Part II of the court's opinion.

BOGGS, Circuit Judge.

The General Electric Company ("GE") appeals from an award of attorneys' fees to a "whistleblower" who brought a *qui tam* action against the company. For the reasons set forth below, we affirm the constitutionality of the federal *qui tam* laws; we reverse the district court's decision to deny GE access to portions of a deposition that was taken *in camera;* and, while generally affirming the award of attorneys' fees, we remand the matter to the district court with instructions to reduce certain components of the award and to conduct further factfinding proceedings.

I

General Electric Aircraft Engines ("GE Aircraft"), a consolidated affiliate of the General Electric Company sold jet engines to the United States Air Force for resale to the Israeli Ministry of Defense. Concurrently, GE Aircraft contracted with Israel's defense ministry to supply support equipment and services for those engines and to sell Israel additional engines. These transactions were financed by the United States out of funds allocated for military aid to Israel. Therefore, the federal False Claims Act applied to these contracts.

A

In the False Claims Amendments Act of 1986 ("FCA" or "the Act"),[1] Congress includ-

---

[1] False Claims Amendments Act of 1986, Pub.L. No. 99–562, 100 Stat. 3153 (codified, as amend-ed, at 31 U.S.C. §§ 3729–3733).

ed a *qui tam* [2] provision to encourage corporate "whistleblowers." 31 U.S.C. § 3730. A *qui tam* plaintiff (or "relator") may bring a private civil action on behalf of himself and on behalf of the United States government against a defendant who, in violation of 31 U.S.C. § 3729, has submitted false claims to the government for payment. *Id.* § 3730(b)(1). The *qui tam* action is filed under court seal, and the relator must supply the government with a copy of the complaint and with written disclosure of substantially all material evidence and information that the plaintiff possesses supporting the charges. *Id.* § 3730(b)(2). The Justice Department has sixty days to review the claims and may move the court to extend that period; during that time, the proposed defendant is not notified of the claim. *Id.* § 3730(b)(2), (3). If the government chooses to intervene in the action, it assumes the role of lead prosecutor. *Id.* § 3730(b)(4)(A), (c)(1). In the alternative, it may decline to join the action, leaving the *qui tam* plaintiff as the sole prosecutor. *Id.* § 3730(b)(4)(B).

If the government does intervene, it may reach a settlement with the defendant, even over the relator's objections, if the court finds, after a hearing that may be held *in camera,* that such a settlement is fair, adequate, and reasonable under all the circumstances. *Id.* § 3730(c)(2)(B). If the government chooses to intervene, it can move the court to limit the relator's participation if it feels that the relator will interfere with or unduly delay the government's prosecution of the matter. *Id.* § 3730(c)(2)(C). Even if the government chooses not to intervene in the action, it may still require the relator to serve it with copies of all filed pleadings and all deposition transcripts, and it may intervene later in the case upon showing good cause. *Id.* § 3730(c)(3). Moreover, even when it chooses not to intervene, the govern-

ment may move that certain discovery actions by the relator be stayed for sixty days, and the motion may be renewed. *Id.* § 3730(c)(3).

If the government chooses to intervene, and a sum of money is collected from the defendant as a result of the ensuing action or settlement, the relator is to receive a bounty between 15–25% of the collected sum ("the bounty"). The exact percentage depends upon "the extent to which the person substantially contributed to the prosecution of the action." *Id.* § 3730(d)(1).[3] If the relator "planned and initiated" the fraud, the court may substantially reduce the award, but should also consider the "role of that person in advancing the case to litigation"; however, a relator convicted of criminal conduct relating to the fraud cannot collect. *Id.* § 3730(d)(3). Similarly, the relator must be a true "whistleblower"; therefore, he is precluded from collecting a bounty if the case is brought on the basis of information that has already been publicly disclosed, *id.* § 3730(e)(4), or if someone else has filed the claim first. *Id.* § 3730(b)(5). The FCA *qui tam* statutes also contain a fee-shifting provision that aims at inducing "whistleblowers" to step forward and attorneys to pursue such actions:

> Any such [relator] shall also receive an amount for *reasonable expenses* which the court finds to have been *necessarily incurred,* plus *reasonable attorneys' fees* and costs. *All* such expenses, fees, and costs shall be awarded *against the defendant.*

*Id.* § 3730(d)(1) (emphasis added).

**B**

In November 1990, Relators–Plaintiffs–Appellees Walsh and Taxpayers Against Fraud ("TAF") filed a *qui tam* action against GE

---

**2.** Lit. "who as well." A "whistleblowing" suit is called a *"qui tam* action" because the plaintiff is one *who* sues for the government *as well* as for himself. *Black's Law Dictionary* 1126 (5th ed.1979).

**3.** If the government does not intervene and proceed with an action under 31 U.S.C. § 3730, the relator "shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall not be less

than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds." *Id.* § 3730(d)(2). Such a relator also receives "an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." *Ibid.* The expenses, fees, and costs are awarded against the defendant.

under 31 U.S.C. § 3730, alleging that GE Aircraft had billed the United States Treasury for millions of dollars in false claims. The United States intervened in August 1991 and took the lead role in the prosecution. A settlement was reached before trial, in which GE agreed to pay $59.5 million in civil damages and $9.5 million in criminal fines, as well as $6,158,301 in restitution, for a total payment of more than $75 million to the United States Treasury.

### 1. The Relators'–Share Litigation

A hearing was held in United States district court, pursuant to 31 U.S.C. § 3730(d)(1), to determine the relators' share of the civil-damages settlement. We note that the "relators' share" is paid from the amount recouped by the government; therefore, the government has an interest in minimizing that share. The court awarded relators 22.5% of the $59.5 million, nearly the maximum percentage permitted by statute. The United States filed a notice of appeal, seeking to reduce that award, and the relators settled with the government for about 19% of the settlement, or approximately $11,-300,000. Hereinafter, we shall refer to this litigation between the United States and the relators as "the Relators'–Share Litigation."

### 2. The Attorneys' Fees Litigation

After the Relators'–Share Litigation ended, the relators moved in federal district court, pursuant to 31 U.S.C. § 3730(d)(1), to recoup from GE their reasonable attorneys' fees and costs, as well as their reasonable and necessarily incurred legal expenses. GE sharply challenged the relators' claims on a number of grounds. However, the district judge ordered GE to pay $2,329,228.50 in attorneys' fees and $226,875.17 in costs and expenses. The law firm of Hall & Phillips provided approximately 80% of Walsh's, and nearly all of TAF's, legal services. Therefore, that firm's share of the relators' attorneys' fees exceeded $1.8 million. Hereinafter, we shall refer to this litigation, which

pitted GE against the relators and their attorneys, as "the Attorneys' Fees Litigation."

### 3. The Contingency Fee Agreement

In a separately negotiated arrangement, Walsh had promised to pay his legal counsel 25% of whatever bounty he ultimately collected from the qui tam action. Since Walsh received approximately $11,300,000 from the Relators'–Share Litigation, his contingency-payment agreement called for him to pay his attorneys approximately $2,825,000. Therefore, Hall & Phillips's 80% portion of the contingency fee came to approximately $2,260,000. Thus, having won more than $1.8 million as its share of the fees that were awarded during the Attorneys' Fees Litigation, Hall & Phillips's total fees for its part in this qui tam action amounted to more than $4 million, approximately half payable by the relators from their $11.3 million bounty and half payable by GE from its corporate funds. Usually, a statutory fee would be awarded to the plaintiff rather than to the lawyers. Evans v. Jeff D., 475 U.S. 717, 730, 106 S.Ct. 1531, 1538–39, 89 L.Ed.2d 747 (1986). The plaintiff could then use the statutory fee to satisfy the contingency fee. In this case, though, Walsh's contract with Hall & Phillips calls for him to pay the statutory fee to Hall & Phillips in addition to any contingency fees.

### C

GE contended throughout the course of the Attorneys' Fees Litigation that Walsh had participated in GE Aircraft's fraud against the United States. Because GE settled the qui tam action prior to trial, the facts concerning GE Aircraft's false claims and Walsh's exact role in that fraud were never fully determined in a court of law. At one point during the final day of the Attorneys' Fees Litigation, the district court said that "[t]here is not one iota of evidence before me that Mr. Walsh participated in the fraud. Not one." However, the judge's remarks were not confirmed as part of the court's formal findings.[4] Indeed, because the

---

4. Earlier, during the Relators'–Share Litigation, the judge had said to the government's attorney,

who had been arguing that Walsh should have acted sooner:

record before us contains several disputed facts that were not resolved on the district court level, we next set forth distilled versions of the parties' conflicting accounts of the events that underlie this appeal. We begin with Walsh's version.

### 1. Walsh's Version of the Facts

By the summer of 1984, Herbert Steindler, an international marketing sales manager for GE Aircraft, and Lt. Col. Rami Dotan, an officer in the Israeli Air Force (IAF), had begun conspiring to defraud the United States government out of military-aid funds earmarked for Israel's defense. Eleven million dollars of these funds ended up in personal Swiss bank accounts that Steindler and Dotan secretly controlled. A few months later, in December 1984, Walsh arrived in Tel Aviv to serve as GE's liaison to the Israeli military on a contract for the maintenance and support of F110 fighter engines sold to the IAF. Walsh, who had been working for GE since 1964, reported to Stringer, the F110 program manager. Stringer answered to Steindler.

Walsh realized in May 1987, for the first time, that Stringer and Dotan had submitted false claims to the United States government for millions of dollars of work that had not been performed. He wanted to correct the situation but did not know what to do. He feared the "powerful and ruthless" Dotan, now a brigadier general, who had the influence to have GE Aircraft workers in Israel fired.[5] Moreover, Walsh feared for his personal safety.

In mid–1987, during a business visit to the United States, Walsh adopted the assumed name of "John Wallace" and consulted attorney John R. Phillips, a name partner in the law firm of Hall & Phillips, to explore his legal options. He did not reveal that his employer was GE or that he worked in Israel. He gave Phillips no address; rather, he sought preliminary legal advice and said that he would contact him again. In addition, he applied to GE for a transfer out of Israel, and he began collecting and preserving evidence, including secretly tape-recording conversations, that could document his charges of fraud. His transfer to Switzerland was approved in February 1989. In preparing to leave Israel, he packed his highly sensitive evidence among common household goods for shipment to Switzerland.

In July 1989, Walsh brought his evidence to America. He went to Phillips's firm and revealed his true identity to the attorneys. They began to assess whether he had grounds to bring a *qui tam* action on behalf of the United States. In 1990, he signed a retainer with the firm, agreeing to pay them a 25% contingency fee on any bounty that they would help him recover under the FCA. Walsh's attorneys began reviewing thousands of pages of documents and unraveling a dozen separate fraud schemes. After a preliminary version of the *qui tam* complaint was prepared in late 1990 and local counsel in Cincinnati were retained,[6] Brig. Gen. Dotan was arrested in Israel on October 28, 1990, on charges unrelated to the GE Aircraft allegations. The formal *qui tam* action was filed less than three weeks later, on November 15, 1990. However, the filing date was not affected by the timing of Dotan's arrest and indictment. In the action, Walsh sued as

---

[Y]ou weren't there. It wasn't you who were at risk. . . .

When you discuss what [Walsh] could have done, you're right. Oh, you're absolutely—well, you're correct. You may not be right. But we aren't dealing in a vacuum. He's taking on one of the outstanding military persons in Israel, and frankly I don't blame him for being scared.

J.A. at 424.

5. In early 1989, another GE Aircraft employee, Alaric Fine, also developed suspicions of corporate wrongdoing and reported his concerns to Steindler. Fine was removed from his position a few days later, after Brig. Gen. Dotan found out

about his allegations. Dotan insisted that Fine "never go to Israel again." Fine never did. GE did not pursue Fine's allegations.

Indeed, in Walsh's version, the only steps that GE took to root out the corruption at GE Aircraft were taken when GE learned that Steindler had not only been diverting funds from the United States government but had also been embezzling *from GE*. At that point, GE "blew the whistle" and reported Steindler to the government.

6. GE Aircraft is headquartered in Ohio. Therefore, venue lay in the United States District Court for the Southern District of Ohio. 31 U.S.C. § 3732(a).

a private citizen on behalf of the United States.

Shortly after filing his action, Walsh met several times with representatives of the Department of Justice. His complaint and disclosure statement were used by federal investigators to obtain search warrants. Furthermore, Walsh substantially assisted the government's investigation of GE by wearing a concealed recording device at the company's Evendale, Ohio, facility, and at a restaurant where he met a GE employee, to obtain additional evidence.

Thus, in Walsh's portrayal of events, he and his attorneys acted vigorously and as swiftly as prudence allowed to expose GE's false claims and fraudulent practices.

### 2. GE's Version of the Facts

GE claims that Walsh managed GE Aircraft's office in Israel from the beginning of 1985 to early 1989. He had the principal responsibility for administrating GE Aircraft's contracts with Israel, and he was GE's primary liaison with the IAF, working closely with Dotan. When the Israelis asked GE Aircraft to join in a fraudulent scheme to divert United States military aid for the purchase of unauthorized IBM PCs, Walsh "planned and initiated" the fraud,[7] even directing the creation of false-claim documentation and devising the paper trail by which the transactions were structured. In 1986, he helped Dotan "plan and initiate" another series of fraudulent transactions, helping divert $4.2 million in military-aid funds by preparing counterfeit invoices and work-completion certificates that falsely claimed that GE Aircraft had performed work it had not done. At least seven other such schemes followed, involving false claims of more than $20 million, all "planned and initiated," or at least significantly abetted, by Walsh with the clear understanding that the false claims were defrauding the United States. Finally, GE transferred Walsh to Switzerland in 1989.

During all his time in Israel, while conspiring with Dotan, Walsh never knew that Steindler was running his own false-claim scam with the Israeli general. It was GE, not the devious Walsh, who took the initiative that brought the Steindler swindles to light, "blowing the whistle" *on itself* after uncovering the schemes internally. Ultimately, GE submitted more than 75,000 documents to the government and made 300,000 documents available. GE also met with government investigators for more than 200 hours, briefing them on the results of the company's internal investigation of corruption at GE Aircraft.

GE points to its alacrity in uncovering and revealing internal misconduct as proof that it would have acted swiftly to root out any other internal corruption or fraud if Walsh had reported it, as he was required to do. GE has "compliance policies" that require its employees to certify annually in writing that they are complying with the corporation's policies that prohibit misconduct while doing business with the United States. Moreover, GE employees are required to report any violations of the compliance policies that come to their attention. Furthermore, the company facilitates internal "whistleblowing" by enabling employees to report their suspicions through anonymous channels if they prefer. However, Walsh never reported what he knew. Rather, he falsely certified in writing each year that he was complying with GE's policies, which include reporting others' suspected wrongdoings.

GE contends that, if Walsh were concerned about internal fraud, he could have reported his suspicions, and the company would have acted vigorously. Furthermore, and significant to this appeal, if Walsh were absolutely intent on suing for personal gain under the *qui tam* laws, he could have brought his action as early as mid–1987, by which time $13.1 million in false claims had accrued. Instead, desiring to reap an even greater "whistleblower's" windfall, Walsh methodically delayed bringing his *qui tam* action for three and a half more years,

---

**7.** The term in quotations is significant. Under 31 U.S.C. § 3730(d)(3), the relator's bounty may be significantly reduced, in the court's discretion, if he "planned and initiated" the violations charged in the *qui tam* action. However, the reduction is discretionary, and the court is also to consider the relator's role in advancing the case to litigation. *Ibid.*

watching the amount of false claims steadily grow to $41.6 million. Moreover, the attorneys at Hall & Phillips, to whom Walsh had been turning for counsel from mid–1987, encouraged him to procrastinate. For example, at one point in 1989, Walsh's lawyer, Mary Louise Cohen, advised him to "try not to sign the [compliance-policy] forms" if possible. Thus, Walsh carefully evaded his responsibilities to GE under the compliance policies, because both he and his attorneys understood that GE Aircraft's fraudulent billing practices would continue undetected, resulting in an increasingly large bounty and in higher contingency fees.

Walsh finally filed suit in 1990, but only because Dotan's unexpected arrest compelled him to race to the courthouse. Otherwise, if a newspaper were to report that the indicted Israeli general was being investigated in connection with false claims at GE Aircraft, Walsh and his attorneys might be precluded by statute from bringing their suit, and any bounty that could be collected would certainly have been limited to a 10% ceiling. 31 U.S.C. § 3730(d)(1), (e)(4).[8]

### D

On November 15, 1990, Walsh filed an FCA action *in camera* against GE. He was joined by Taxpayers Against Fraud, a nonprofit corporation established to support the enforcement of the FCA. Although TAF has its own address in Washington, D.C., an executive director, a staff of five, and an independent board of directors, it concedes that 95% of its expenses have been incurred as legal fees to Hall & Phillips, and it was founded substantially by John R. Phillips. GE portrays TAF as a Hall & Phillips front. Because the record insufficiently addresses this matter, we shall hereinafter use the nouns "relators" and "Walsh" interchangeably.

The action remained under seal for nine months, as the United States requested extensions of the statutory sixty-day seal, 31 U.S.C. § 3730(b)(2), citing "national security concerns" and the need to obtain evidence from Israel and elsewhere. In July 1991, the court turned down a government request to seal the case further. As a result, the Justice Department exercised its statutory right to intervene and took control of the case's prosecution. The government pursued an out-of-court settlement with GE, and the parties agreed a year later, in July 1992, that GE would pay the unprecedented sum of $59,500,000 in civil damages to settle the case, as well as $6,158,301 in restitution, representing the funds found in the Dotan–Steindler Swiss accounts. The court dismissed the case, retaining jurisdiction to decide two collateral matters: (1) the relators' share of the civil settlement, and (2) GE's obligations to pay Walsh's attorneys' fees, legal expenses, and court costs under the *qui tam* fee-shifting provision.

### 1. The "Relators'–Share" Litigation

The first collateral dispute was between the relators and the government over the division of the GE civil settlement. The day that the settlement was reached, GE issued a press release, stating that "Mr. Walsh 'should receive no bounty or sharply reduced bounty.'" *See* Amal Kumar Naj, "General Electric Pleads Guilty, Pays $69 Million to Settle Whistleblower Suit," *Wall St. J.*, July 23, 1992, at A2. The corporation then began to press the government to withhold awarding a bounty to Walsh or TAF. For the next four months, Walsh and TAF were unable to reach an agreement with the government concerning a mutually acceptable relators' share of the settlement. After extensive discovery, the parties brought their dispute to district court for a hearing that began on

---

**8.** Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions ... from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds....
31 U.S.C. § 3730(d)(1).

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions ... from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
*Id.* § 3730(e)(4)(A).

November 2, 1992. The court excluded GE, over its objection, from participating as a party to the action, because the company had no financial interest in the outcome of the Relators'–Share Litigation. Nevertheless, GE actively helped prepare the government's case against Walsh and TAF, sending its attorneys to attend all but one of the pre-hearing depositions, and even submitting a thirteen-page "proffer" to the district court that explained why the relators should be denied a bounty.

In order to resolve the dispute, the court needed to obtain factual information on the exact nature and extent of the relators' role in bringing GE to justice. Therefore, it sought the testimony of FBI Agent Kosky, who led the government's investigation of the relators' charges beginning November 19, 1990, four days after the relators filed their *qui tam* action. Because Agent Kosky's investigation was still in progress, focusing on additional matters related to the underlying charges, the FBI and the relators agreed to a procedure in which the relators' attorneys submitted written questions for Kosky in advance, and the judge questioned him *in camera* ("the Kosky deposition"). Only the government's attorneys were present at the Kosky deposition, and the court ordered the transcript of the Kosky testimony sealed. Therefore, neither the relators' attorneys nor GE's counsel heard or have read what Kosky said. On December 4, 1992, the court awarded the relators a 22.5% share of the civil recovery. As noted above, the relators ultimately settled for $11,300,000, comprising approximately 19% of the civil recovery.

### 2. The "Attorneys' Fees" Litigation

The losing defendant in an FCA *qui tam* action must pay the reasonable attorneys' fees and court costs of the victorious relators, ·as well as all reasonable and necessarily incurred expenses. 31 U.S.C. § 3730(d)(1). In the second collateral dispute, the district court conducted a two-day hearing to determine the appropriate fees, expenses, and costs to award against GE. Walsh and one of his attorneys, Mary Cohen, testified. During the course of earlier status conferences that were held in June and July 1992,

there were a few testy exchanges between the district judge and GE's attorneys, in which the judge made statements indicating that he had tried prior litigation involving GE and had emerged from those experiences with a negative impression of the corporation. In one such statement the judge said: "[P]erhaps I shouldn't let my views of General Electric and the Justice Department as they have been displayed to me in the past interfere with this case. Maybe you guys have turned over a new leaf. I doubt it, but maybe." In another such statement, the judge asked defense counsel to pass along a message: "You tell your client that they're in enough trouble with me, because I don't trust them to this day." The judge also said, "One thing I might suggest to [GE] is start hiring honest people."

Hall & Phillips prepared a breakdown of the billable hours that their attorneys had worked on the case, and the firm submitted its rate schedule for legal services. GE stipulated to the reasonableness of the rates and most of the hours. However, GE raised a number of policy-based objections, which the court rejected and which comprise the crux of this appeal. As noted above, the court ordered GE to pay a total of $2,329,228.50 in attorneys' fees, as well as $226,875.17 in costs and expenses. Hall & Phillips's share of that award exceeded $1.8 million. Consequently, when combined with the $2.26 million that it received in contingency fees, Hall & Phillips emerged from this FCA action with combined fees of more than $4 million.

General Electric appeals from the award of attorneys' fees, expenses, and costs.

### II

GE maintains that the *qui tam* provisions of the FCA are unconstitutional. Therefore, the entire statutory framework under which GE has been ordered to pay Walsh's attorneys' fees, expenses, and costs is invalid. First, GE argues that, while Congress may surely offer financial incentives to private citizens to bring fraudulent practices to the government's attention, the legislative branch may not "deputize" private citizen volunteers to prosecute claims in the name of the United States government. Rather, the

prosecutorial function is an executive-branch responsibility. Second, GE contends that the *qui tam* scheme seriously interferes with the executive's prosecutorial discretion. Among its major concerns, GE warns that a relator may file an action too soon, leading to the premature disclosure of a tightly guarded, meticulously conducted investigation by the Justice Department. Similarly, a relator may bring a case that the United States does not want to prosecute currently, thereby precluding the government from pursuing that action later.

Finally, while recognizing that *qui tam* provisions have been in our statutes from the time of the First Congress, GE observes that other laws enacted by the First Congress have ultimately been declared unconstitutional.

We note that these same issues were raised recently before the Ninth Circuit in the first-impression case of *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994). That court unequivocally rejected the same constitutional challenge. We join with our sister circuit in upholding the constitutionality of the federal *qui tam* laws.

■ The *qui tam* provisions adopted by Congress do not contradict the constitutional principle of separation of powers. Rather, they have been crafted with particular care to maintain the primacy of the Executive Branch in prosecuting false-claims actions, even when the relator has initiated the process. Indeed, if the government decides against intervening in the relator's case, it may still require the relator to inform it of developments and to forward copies of the claims, the material evidence and information, and copies of depositions taken. In fact, after turning down the opportunity to intervene, the government may still inter-

vene later upon a showing of good cause. Similarly, the government may move to have the relator's litigation role significantly restricted, even as it may conduct settlement talks or even decide that the case should be dismissed. Nor will the relator's initial filing of a claim in federal court alert the defendants and trigger an evasive mechanism, because the statute clearly requires the relator's filings to be sealed for at least sixty days, and for much longer if the government can show the need, as was the case in this litigation. Thus, the Executive Branch retains "sufficient control" over the relator's conduct to "ensure that the President is able to perform his constitutionally assigned dut[y]," *Morrison v. Olson,* 487 U.S. 654, 696, 108 S.Ct. 2597, 2622, 101 L.Ed.2d 569 (1988), to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

■ Similarly, we are not persuaded by GE's claim that the *qui tam* provisions violate the Appointments Clause of the Constitution. U.S. Const. art. II, § 2, cl. 2. Although a relator may sue in the government's name, the relator is not vested with governmental power. Indeed, as noted above, the government may take complete control of the case if it wishes. Furthermore, the relator's "position is without tenure, duration, continuing emolument, or continuous duties." *Auffmordt v. Hedden,* 137 U.S. 310, 327, 11 S.Ct. 103, 108, 34 L.Ed. 674 (1890). Therefore, the relator is not an "officer" within the meaning of the Appointments Clause. *Ibid.*

Our current statutory framework includes many laws that authorize individuals to act as "private attorneys-general," bringing causes of action for the common weal. To encourage such private actions, Congress has provided fee-shifting provisions in those laws as well.[9] We view the *qui tam* laws here as

9. *See, e.g.,* 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 5 U.S.C. § 552a(g)(2)(B), (g)(3)(B) (Privacy Act); 15 U.S.C. §§ 2618(d), 2619(c)(2) (Toxic Substances Control Act); 28 U.S.C. § 2412 (Equal Access to Justice Act); 29 U.S.C. § 216(b) (Equal Pay Act of 1963); 29 U.S.C. § 1132(g)(1) (Employee Retirement Income Security Act of 1974); 33 U.S.C. §§ 1365(d), 1369(b)(3) (Clean Water Act); 42 U.S.C. § 1988 (Civil Rights Attorney's Fees Awards Act of 1976); 42 U.S.C. § 2000e–5(k) (Title VII of the Civil Rights Act of 1964); 42 U.S.C. § 3613(c)(2) (Fair Housing Act); 42 U.S.C. § 6972(e) (Resource Conservation and Recovery Act); 42 U.S.C. §§ 7604(d), 7607(f) (Clean Air Act); 42 U.S.C. § 9659(f) (Comprehensive Environmental Response, Compensation,

encouraging "whistleblowers" to act as "private attorneys-general," too, in pursuit of an important public policy. Thus, we uphold the constitutionality of the *qui tam* provisions authorizing "whistleblowers" to bring false-claims actions in the name of the government. 31 U.S.C. § 3730. *See also United States ex rel. Milam v. University of Tex. M.D. Anderson Cancer Center,* 961 F.2d 46, 49 (4th Cir.1992) ("Congress has let loose a posse of *ad hoc* deputies to uncover and prosecute frauds against the government. [Defendants] may prefer the dignity of being chased only by the regular troops; if so, they must seek relief from Congress.").

## III

GE next appeals from the district court's decision to deny it access to a transcript of the Kosky deposition. GE maintains that the court prejudicially allowed evidence obtained during the Relators'–Share Litigation, including that gleaned from the *in camera* deposition, to influence its judgment later during the separate Attorneys' Fees Litigation.[10]

During the Attorneys' Fees Litigation, Walsh's lawyer asked the court, "[M]ay I assume that, to the extent anything Mr. Walsh testified to previously before this [c]ourt that's relevant ... that that is also part of this record, the [attorneys'] fee [litigation] record as well as the—" The court then interjected that "[e]verything I have heard in the Walsh case, so far as I'm concerned, is before me." General Electric contends that this comment suggests that Kosky's unconfronted testimony *may have* influenced the judge's decisions to award substantial attorneys' fees to the relators and

against GE. When GE raised this concern in the district court, the judge responded, "I'm truly not aware of any evidence presented in that [Relators'–Share Litigation] case that bears upon the legal advice [Attorneys' Fees Litigation]." That comment seems to indicate that Kosky's deposition did *not* affect the attorneys' fees award. Because of the confusion in the record before us, we cannot determine whether the Kosky deposition played a role in the court's handling of the separate Attorneys' Fees Litigation.

■ However, while we agree with the district court's decision to receive Agent Kosky's deposition *in camera,* in order to protect sensitive information regarding an ongoing FBI investigation from being compromised, we hold that the court erred in refusing to make appropriate portions of the transcript available to opposing counsel. *See, e.g., United States v. Wind,* 527 F.2d 672, 675–76 (6th Cir.1975) (vacating a district court's decision setting bail for a defendant, whose "dangerous ... violent propensities" had been corroborated on the record by "substantial evidence," because the district judge had "apparently relied also upon the testimony [received] at the *in camera* hearing from which the defendant and his attorney were excluded"). Furthermore, we hold that the district court should have allowed both GE and the relators an opportunity *in camera* to cross-examine Agent Kosky, under an appropriate protective order to protect the confidentiality of the testimony.

We therefore vacate the court's award of attorneys' fees, with instructions that the court screen the Kosky deposition transcript for security-sensitive material, including information related to ongoing FBI investiga-

---

and Liability Act); 42 U.S.C. § 12205 (Americans with Disabilities Act of 1990).

**10.** In the course of the order it issued at the conclusion of the Relators'-Share Litigation, the district court noted that Agent Kosky had praised Walsh's assistance in the government's prosecution of GE and that the Agent's deposition had helped influence it to award the relators a 22.5% share of the $59.5 million civil settlement:

In the words of Agent Kosky, Mr. Walsh's contribution was substantial. The actual language is as follows:

. . . .

The government knew absolutely nothing that had gone amiss at General Electric. General Electric had taken substantial measures to cover it up for a space of two years. I have no reason to believe that anyone within General Electric would have ever told us besides Mr. Walsh. Mr. Walsh brought us the only information that we had.... [T]he fruits of the criminal and civil cases that were settled last summer are a direct result of what Mr. Walsh brought us and *would have come from no other source to my knowledge to this day.*

J.A. at 147–48 (emphasis added by district court).

tions, and then provide edited copies of the transcript to both GE's and relators' attorneys. After providing the edited transcripts to the attorneys, the court shall convene an *in camera* deposition of Agent Kosky, subject to an order that protects the confidentiality of his testimony, at which time the attorneys for the respective parties will have the opportunity to question and cross-examine Agent Kosky with regard to matters that appear in the edited transcripts of the previous deposition. We do not express an opinion as to whether the original Kosky deposition contains any information that will be helpful to GE or whether the opportunity to confront Agent Kosky and to cross-examine him will open any new avenue of legal recourse by which GE can persuasively seek a reduction in the amount of attorneys' fees awarded by the district court to the relators. Indeed, the judge stated that he had found "not one iota of evidence ... that Mr. Walsh participated in the fraud. Not one." Nevertheless, we hold that GE's ability to litigate its opposition to Walsh's claim for attorneys' fees was unfairly affected by the court's refusal to allow the company appropriate access to the Kosky deposition transcript and to Kosky himself. Therefore, we vacate the fees award and remand with instructions.

**IV**

In another assignment of error, GE argues that, even if Walsh and his counsel deserve attorneys' fees under the *qui tam* laws, those fees should have been sharply reduced to reflect the relators' allegedly deliberate scheme to delay filing an action, systematically "running up" attorneys' fees and trebling the relators'-share bounty. GE does not challenge the authenticity of the lodestar numbers by which the court calculated fees. The company accepts that Walsh's attorneys worked on the case for the amount of time that they claim, and GE accepts their hourly fee schedule as reasonable. Instead, GE claims that the action could have been filed in 1987, when Walsh first approached Attorney Phillips and the amount of false claims stood at $13.1 million. With the passage of three years, until Dotan's 1990 arrest in Israel, the stakes had risen to $41.6 million. Therefore, citing the statutory text, GE claims that most

of Walsh's attorneys' fees were not "reasonable," and that the legal expenses were neither "reasonable" nor "necessarily incurred."

By contrast, Hall & Phillips contends that GE overstates the nature of the firm's relationship with Walsh before 1989. Thus, the firm portrays the mid–1987 meeting between Walsh and Phillips as one in which Walsh merely sought "preliminary counsel." At that time, he gave Phillips a false name, and he refused to leave an address where he could be reached. It was only in mid–1989, when Walsh left Israel for good and also shipped his documents out of that country, that the law firm could seriously undertake the preliminary research necessary to assess the merits of Walsh's charges. Indeed, Walsh did not formally engage the firm as legal counsel until the spring of 1990. By then, Hall & Phillips had been working assiduously, evaluating and researching Walsh's accounts of fraud and false claims. Their inquiry entailed comprehensive investigation and analysis of complex and highly technical, multi-million-dollar military contracts, many of which had been skillfully drafted to conceal fraud, involving as many as a dozen separate GE Aircraft diversionary schemes. Until the firm had methodically completed its own independent investigation of Walsh's charges, it could not responsibly file a multimillion-dollar federal action on the mere assertion of a secretive, pseudonymous figure.

Attorney Cohen explained the delay:

[I]n '87 and '88, we had no documents, no information. We didn't even have Mr. Walsh's correct name. In July of 1989, Mr. Walsh had left Israel and brought us a box of documents and asked us—we started reviewing the documents to determine whether there was a basis to file a false claims case. By early 1990, we had concluded that there was a basis to undertake to draft a complaint and disclosure statement and to file them. It's a very complicated case. It involves foreign policy issues. It involves foreign military sales laws, which are very obscure.

And I was concerned that, because it involved a foreign state, an ally of the United States, a powerful Israeli general,

unless the case was done thoroughly, completely and as accurately as was humanly possible, the case might never see the light of day, and we thought that the more compelling we could make the case the better chance there was that the case would actually some day be unsealed and be allowed to proceed.

This is indeed a very complex case. And the record reflects that, even after Hall & Phillips filed the *qui tam* action, the government sought and obtained extra time to conduct its own investigation of the charges, in order to corroborate the charges contained in the relators' sealed complaint. Eight months after the relators' November 1990 filing, the government was still asking the district court for additional time to investigate.

■ We have carefully examined the record, but we find insufficient information by which to review the district judge's bases for determining that virtually all of the relators' attorneys' fees were reasonable and that their legal expenses were necessarily incurred and reasonable. Among the factual disputes in this appeal, the record before us reflects that at least seven significant questions remain as yet unresolved:

(1) Did Walsh's evasion of GE's "compliance policy" unfairly deny GE an opportunity to conduct an internal corporate investigation of the corrupt practices at GE Aircraft?

(2) If so, did that evasion unduly extend the subsequent litigation process, resulting in unreasonably greater expenses and attorneys' fees?

(3) From 1987 to 1989, did Walsh unnecessarily delay sending his legal counsel the documents necessary for them to begin assessing the merits of his claims?

(4) If so, did that delay unduly extend the subsequent litigation process, resulting in unreasonably greater expenses and attorneys' fees?

(5) What was the nature of the lawyer-client relationship between Walsh and Hall & Phillips from 1987 to 1989?

(6) Did Hall & Phillips procrastinate from mid–1987, choosing to file Walsh's claims at the latest possible moment,

thereby unduly extending the subsequent litigation process, resulting in unreasonably greater expenses and attorneys' fees?

(7) Are there any ethical considerations in the relationship between TAF and the Phillips firm that should affect TAF's portion of the attorneys' fees award?

Pending resolution of the significant factual disputes that underlie this appeal, we can express no opinion as to whether the court awarded reasonable attorneys' fees. Having already vacated the award of attorneys' fees and remanded this matter, *see supra,* pages 1042–43, we also instruct the district judge to conduct further factfinding proceedings to resolve the parties' conflicting claims over whether the relators' delay in filing their action was aimed at "running up costs" and at increasing the prospective bounty. In the course of the proceedings on remand, the judge should also consider how, or whether, his findings affect the lodestar that he adopted in the Attorneys' Fees Litigation.

■ In addition, the judge should broaden his inquiry into the role that TAF played in this litigation. First, the judge should determine whether TAF had standing to act as a co-plaintiff with Walsh. *See* 31 U.S.C. § 3730(e)(4)(A), (B); *United States v. Rockwell Int'l Corp.,* 730 F.Supp. 1031 (D. Colo.1990) (holding TAF had no standing in similar case). If TAF had no standing, then the statutory fee award must be reduced by the amount of the award attributable to TAF's legal fees. Second, the judge should investigate whether Hall & Phillips's relationship with TAF violated ethical canons. *See Model Rules of Professional Conduct* Rule 1.8(j) (prohibiting lawyer from acquiring proprietary interest in subject matter of litigation). The judge should determine whether TAF's involvement as a co-plaintiff is tantamount to participation by Hall & Phillips as a plaintiff in the case. If TAF is in fact ·a front for Hall & Phillips as well as a co-plaintiff in the case, then the ethical mandates of Rule 1.8(j) have been implicated. Third, the judge should determine the validity of the contracts involving Walsh, TAF, and Hall & Phillips. If the contracts fail for lack of consideration or other reasons, the judge should make appropriate findings mod-

ifying the division of the bounty and the contingency fees among the parties.

## V

GE also contends that the district judge should not have ordered it to pay the approximately $1 million in attorneys' fees, legal expenses, and costs that Walsh incurred while conducting his separate Relators'-Share Litigation against the government. GE notes that the Relators'-Share Litigation had nothing to do with the company; rather, those proceedings involved an internal dispute among the victorious plaintiffs. Indeed, the district court barred GE counsel from attending the *in camera* hearing and from submitting deposition questions to Agent Kosky.

The relators reply that GE was more involved than the record superficially indicates. GE encouraged the government to withhold Walsh's portion of the bounty. The corporation assigned its attorneys to support the government's legal team and to attend depositions concerning the issue, and GE even submitted a thirteen-page "proffer" to the court. Consequently, even if GE was not a formal party to the Relators'-Share Litigation, it interposed itself into the proceedings and thereby prolonged the parties' settlement efforts. Therefore, GE has itself to blame for much of the Relators'-Share Litigation costs, expenses, and attorneys' fees that the relators were awarded by the court.

In addition, the relators contend that the statutory scheme of 31 U.S.C. § 3730 recognizes that, from time to time, the *qui tam* plaintiff whose cause is adopted by the government will need to overcome a collateral litigation process and court hearing in order to reach a final settlement with the government over its bounty. Since the entire statutory scheme of § 3730 is to encourage private citizens to assume the heavy initial burdens of bringing a *qui tam* action, by inducing them with promises of a significant financial recovery, Walsh argues that Congress intended that the defendant would have to pay *all* of the relators' costs, legal expenses, and attorneys' fees related to the *qui tam* action, from the preliminary investigations to discovery to settlement, and beyond that to

the final Relators'-Share Litigation over the bounty's allocation. Otherwise, the government, with its superior resources, would be able to intimidate successful *qui tam* plaintiffs into giving up significant portions of their gains for fear that they might otherwise be compelled to expend all of their anticipated bounty, litigating against the government. Therefore, Congress compelled the blameworthy defendant to pay the full costs that its peculations generate, until the complete goal of § 3730 has been realized, with the final rewarding of the "whistleblower."

■ Walsh's argument has some appeal, but we are persuaded here, despite a certain hypocrisy in GE's stance, that the district judge should not have required GE to pay the attorneys' fees, legal expenses, and costs that Walsh incurred during the Relators'-Share Litigation. The text of the *qui tam* attorneys' fees provision, 31 U.S.C. § 3730(d), does not address the question of who pays for the relators' legal fees and expenses incurred during the course of a Relators'-Share Litigation. Indeed, although the statutory text explicitly states that the relator is to receive between 15% and 25% of the proceeds, in a case in which the government intervenes, it fails to contemplate that a collateral litigation process may ensue between the government and the relator. Instead, 31 U.S.C. § 3730(d)(1), the paragraph dealing with cases in which the government intervenes, uses the same thirty-seven-word formula to describe the relators' rights to attorneys' fees and expenses as does the following paragraph, which deals with cases in which the government does not intervene. *Id.* § 3730(d)(2).

The relators rely heavily on *Kelley v. Metropolitan County Board of Education,* 773 F.2d 677 (6th Cir.1985) (en banc), *cert. denied,* 474 U.S. 1083, 106 S.Ct. 853, 88 L.Ed.2d 893 (1986), a desegregation case in which the defendant school board was ordered to pay the prevailing plaintiffs not only the attorneys' fees incurred by the plaintiffs in the course of their desegregation action against the board but also the additional fees incurred by the plaintiffs as a result of extended litigation brought about by third-party intervenors. *Id.* at 684. However, *Kelley*

is inapposite because in that case the third-party intervenors were directly suing the same defendants; therefore, it remained directly within the defendants' power to determine whether to continue the collateral litigation or to bring it to an end. The defendants instead "vehemently opposed the intervention of the ... intervenors." *Ibid.*

By contrast, in this case, the Relators'-Share Litigation did not directly involve the *qui tam* defendants. Although GE eagerly assisted in the government's efforts to reduce the relators' bounty, GE's role was comparatively peripheral. It had no legal standing or right to participate in the proceedings. Nothing in the record suggests that the government initiated its contest against the relators because of GE, and nothing suggests that GE prolonged the litigation process or could have hastened its conclusion. Therefore, this case is much closer to *Bigby v. City of Chicago*, 927 F.2d 1426 (7th Cir.1991), in which the court awarded attorneys' fees to the prevailing plaintiffs, and against the defendant city, in a Title VII action under 42 U.S.C. § 2000e–5(k), but refused to award those plaintiffs the additional attorneys' fees they incurred during the course of collateral litigation against third-party intervenors. In *Bigby*, as in this case, the plaintiffs "assert[ed] that as between them and the wrongdoer [defendant], it is the wrongdoer who should bear the costs of defending third party interests." *Id.* at 1428. However, the court rejected that line of reasoning. Furthermore, the *Bigby* court noted with approval that:

> the [defendant] City elected not to file an appeal, apparently in order to minimize its losses. This court would be well-served if more losing parties at the district court level made that choice.... [I]f we were to require the [defendants] to pay the Bigby [plaintiffs'] attorney's fees for the appeal taken by the intervenors, it would have the undesired effect of discouraging rather than encouraging a losing party from accepting the district court's decision as the final word.

*Id.* at 1429. In this case, GE chose to minimize its losses by settling its case before the matter even came to trial. As in *Bigby*, the defendant here should not be required to pay the costs incurred by the prevailing plaintiffs in the course of their collateral litigation. *Accord Reeves v. Harrell*, 791 F.2d 1481 (11th Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987).

Therefore, we reverse the award of Relators'-Share Litigation attorneys' fees, legal expenses, and costs to Walsh.

## VI

In ordering GE to pay the relators' attorneys' fees of $2,329,228.50 and costs and expenses of $226,875.17, the court expressed its recognition that Hall & Phillips would be collecting "an extraordinarily high rate of compensation for legal services." The court stated that it nevertheless had no choice but to award the lodestar-based figure to the relators' attorneys. GE argued that the judge misconstrued the law because he had authority to exercise discretion and to refuse to award a sum that virtually duplicated the separately contracted 25% contingency fee. However, the court repeated its understanding that it was constrained by the statute, 31 U.S.C. § 3730(d)(1), to award fees that faithfully followed the lodestar. Moreover, the court cited *Venegas v. Mitchell*, 495 U.S. 82, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990), for the proposition that it is permissible for attorneys to receive both a statutory fee-shifting award and a separately contracted contingency fee in the same case.

The relators and their attorneys reply to this element of GE's appeal, noting that the statute specifically awards attorneys' fees, legal expenses, and costs to the victorious *qui tam* plaintiffs, and those payments are to be made by the defendant. 31 U.S.C. § 3730(d)(1). As for the separately negotiated contingency-fee agreement between the relators and their counsel—that was a separate deal.

Although GE observes that Hall & Phillips ultimately received more than $4 million, an amount equal to more than 35% of their client's $11,300,000 bounty, the numbers can also be viewed from another perspective. Much of the firm's preliminary work and research laid the groundwork for the govern-

ment to step in and settle the FCA civil claim against GE, ultimately resulting in a total $75 million recovery for the government and the relators.[11] Hall & Phillips had prudently directed Walsh to document his charges, to create a record of the false claims, and to cooperate with the government. The law firm brought the action that convinced the government, which delayed intervening for more than eight months, to pursue the claim. Thus, the United States Treasury enjoyed a windfall from the case that Hall & Phillips helped to unravel. Viewed in that light, the attorneys' fees that the firm was awarded by the court under the FCA, *together with* the contingency fee that they received from their separate contract with Walsh, aggregated to less than 6% of the total bonanza that their efforts helped the government win.

Furthermore, Hall & Phillips contends that GE would have no standing to oppose a deal in which Walsh had promised a college or a medical charity 25% of his bounty, nor could the company avoid its 31 U.S.C. § 3730(d)(1) obligation on such grounds. Therefore, if Walsh chose instead to earmark 25% of his bounty as payment to his attorneys, GE's obligations should not be reduced.

■ That argument, though superficially appealing, does not avail. Walsh could have contracted to give the Heart Fund, the Cancer Society, a chauffeur, or a cook 75% of his bounty, if he liked. However, under the rules of ethics adopted by the legal profession, Hall & Phillips would be prohibited from contracting with a client for a 75% contingency fee. Thus, the issue of excessive fees raises serious ethical questions that are somewhat unique to the legal profession. *See Model Rules of Professional Conduct* Rule 1.5(a) (declaring that "[a] lawyer's fee shall be reasonable" and listing eight factors to consider in determining the reasonableness of a fee); *Model Code of Professional Responsibility* DR 2–106 (providing that an attorney "shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee," and further explaining that a fee is "clearly excessive when, after a review

of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee").

■ As we said in *Krause v. Rhodes,* 640 F.2d 214, 218 (6th Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981), "an attorney's right to contract for a contingent fee is not completely beyond judicial control." A lawyer is first an officer of the court, and as such his commercial contractual rights must yield to his duty. The district judge has broad equity power to supervise the collection of attorney's fees under contingency fee contracts. *Id.* at 218.

In itself, there can be no objection to a law firm undertaking a plaintiff-client's risky course of litigation in exchange for a 25% contingency fee. Similarly, the *qui tam* statute's plain meaning reflects the considered intent of Congress to impose on losing *qui tam* defendants the full cost of relators' reasonable attorneys' fees and costs, as well as their reasonable and necessarily incurred legal expenses.

In *Venegas,* an attorney who brought a successful civil rights action sought to collect both a $406,000 contingency fee, based on a contract that granted him 40% of his client's recovery, and a $75,000 statutory award of attorney's fees, under 42 U.S.C. § 1988. The Supreme Court held:

> We have never held that § 1988 constrains the freedom of the civil rights plaintiff to become contractually and personally bound to pay an attorney a percentage of the recovery, if any, even though such a fee is larger than the statutory fee that the defendant must pay to the plaintiff.
>
> ... We have ... accepted, at least implicitly, that statutory awards of fees can coexist with private fee arrangements....
>
> ... [T]here is little reason to believe that [§ 1988 plaintiffs] may not assign part of their recovery to an attorney if they believe that the contingency arrangement will increase their likelihood of recovery.

---

11. In addition to recovering $59,500,000 in civil damages in its settlement with GE, as well as restitution of the $6,158,301 in funds that were found in the Dotan–Steindler Swiss bank accounts, the government collected a $9,500,000 criminal fine from GE.

495 U.S. at 88, 110 S.Ct. at 1683. Similarly, in a case concerning attorneys' fees under the Fair Labor Standards Act ("FLSA"), we held that:

[W]here Congress has authorized the recovery of fees, the [district] court [should] be cognizant that the result achieved is necessarily more than mere financial gain. The recovery of attorney fees is a tool utilized by Congress to encourage the vindication of congressionally identified policies and rights, as well as to enable the plaintiff to obtain damages without expense for legal assistance.

. . . .

. . . [T]he determination of a reasonable fee is to be conducted by the district court regardless of any contract between plaintiff and plaintiff's counsel.

Moreover, the [FLSA] imposes on the errant [defendant] the burden of financing plaintiff's case to the extent of court costs and a judicially determined reasonable rate of pay for plaintiff's counsel. The fact that [plaintiff] has entered into an agreement with the lawyers prosecuting the case does not impact on the statutory burden of the [defendant], as the latter must pay what the district court determines to be a reasonable rate. The existence of a contingency contract may be considered by a district court as an element to be considered in determining the market value of an attorney's services, but the court is not bound in any sense by that agreement. . . . The court therefore concludes that a[n FLSA] fee award should not be limited by a contingent fee agreement. . . .

*United Slate, Tile & Composition Roofers, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 503–04 (6th Cir.1984); *see also Quesada v. Thomason*, 850 F.2d 537, 541 n. 2 (9th Cir.1988) (citing *United Slate* in observing that, in a split among the appellate circuits over whether statutory attorneys' fees should be reduced in a case where separate contingency fees have been contracted between the plaintiff and his attorney, this court holds that the statutory awards should not be capped).

The problem we face in this case is whether the aggregated bonanza, which comes to more than $4,000,000, exceeds the boundaries of professional propriety. The question here is further complicated by GE's argument that, if the attorneys have been overpaid, we should hold that GE, the guilty defendant that Congress expressly designated to pay the relators' fees, 31 U.S.C. § 3730(d)(1), should be excused from some or all of its statutory obligation. Thus, we are being asked to make an equitable ruling for a party with "unclean hands." Yet, if we agree with the principle that underlies GE's appeal from the fees, our other alternative would be to reduce or strike down the independently negotiated agreement between Walsh and his attorneys. We again note that the district court has broad equity powers to do just that if it determines that the overall compensation exceeds the bounds of professional propriety. The curiosity here is compounded by Walsh's apparent satisfaction with his negotiated arrangement; he has not asked us to reduce his fees to Hall & Phillips.

 We need not resolve this troubling ethical question today because our instructions to the district court on remand will modify the attorneys' fees award under the statutory scheme, perhaps reducing the award substantially. Normally, a district court's award of attorneys' fees should be based on the lodestar. The uniform application of lodestar equations is preferred over an unpredictable system in which different trial judges devise their own subjective, spontaneous formulas. *See, e.g., Northcross v. Board of Educ.*, 611 F.2d 624, 636 (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 3000, 64 L.Ed.2d 862 (1980). However, the district judge may make modifications to account for unreasonable and excessive hours or when unique circumstances justify adjustments to hourly rates. *Id.* at 636–38. The judge's discretion is not diminished even when parties have stipulated to the reasonableness of the number of hours and the hourly rate. Moreover, in this case, we observe that § 3730(d)(1) calls for the award of *reasonable* attorneys' fees. On remand, in the course of setting relators' attorneys' fees in a manner that is consistent with the rest of this opinion, the district court should make findings of fact for the appellate

record that will enable us to review the reasonableness of the § 3730(d)(1) award, in light of the standards set by the *Model Rules of Professional Conduct*, the Supreme Court's opinion in *Venegas,* and our court's holding in *United Slate.*

## VII

Finally, we address GE's concern over several opinionated remarks made by the district judge during the course of the proceedings. The judge made at least three statements during the course of status conferences, and at other moments during the attorneys' fees hearings, that provide some support for the argument that he bore a hostile predisposition towards the General Electric Company. It is clear from those remarks that his opinion of the General Electric Company predated the hearing and may have stemmed from extrajudicial experiences or from prior cases involving GE that he had tried. In one statement the judge said: "[P]erhaps I shouldn't let *my views of General Electric* and the Justice Department as they have been displayed *to me in the past* interfere with this case. *Maybe you guys have turned over a new leaf. I doubt it,* but maybe." (Emphasis added.) In another statement, the judge said to defense counsel: "You tell your client that they're in enough trouble with me, because *I don't trust them to this day.*" (Emphasis added.) He also said, "One thing I might suggest to [GE] is start hiring honest people."

 Although neither Walsh nor GE was on trial, the court had before it a claim for more than $2 million in attorneys' fees, expenses, and costs; and it had the discretion to award an entire lodestar or a modified figure. The court chose to award virtually the entire lodestar, making a few minor downward modifications in response to GE's few objections to aspects of the hours claimed.[12] While the judge did not award the relators unfounded attorneys' fees beyond the number of hours or hourly rates that they claimed, and while the record reflects that he fairly considered GE's few fact

challenges against individual lodestar components, we observe that it is important that a judge's remarks not reflect a disinclination to consider the merits of both sides.

The judge's unfortunate comments gave the appearance of prejudice. Because the judge spoke prejudicially, although he decided impartially, we express concern that the district judge's comments compromised the appearance of fairness and justice in the courtroom. The district judge's comments were particularly unhelpful in this case, inviting an appeal to this court and requiring the expenditure of judicial resources, as this panel was compelled to review carefully the record to ascertain whether the judge's forthright expressions of animus towards GE had crept into his decisionmaking process. We are satisfied that it did not, but we do record our dismay over the comments that we found during our review of the record, and which we have cited above.

## VIII

For the foregoing reasons, we: (1) AFFIRM the constitutionality of the federal *qui tam* statutes; (2) REVERSE the district court's decision to deny GE all access to the transcript of Agent Kosky's *in camera* deposition; (3) REVERSE the district court's decision to award Relators'–Share Litigation attorneys' fees, legal expenses and costs to the relators; (4) VACATE the remaining award of relators' § 3730(d)(1) attorneys' fees, pending further findings of .fact as to whether the relators' timing in bringing their *qui tam* action should affect the fee-shifting lodestar and pending determination of whether, consistent with the False Claims Act, TAF has standing to act as a co-plaintiff relator; and (5) REMAND this matter to the district court with instructions to conduct further proceedings consistent with this opinion, including making findings of fact concerning the reasonableness of any § 3730(d)(1) attorneys' fees that are ultimately awarded.

---

**12.** GE successfully persuaded the court that it should not be liable for the attorneys' fees that Walsh incurred in the course of obtaining immu-

nity, testifying before Congress, and addressing members of the media. The court's decisions reduced GE's obligations by $46,353.50.

DAVID A. NELSON, Circuit Judge, concurring.

I concur in the judgment and in all but Part II of the court's opinion, where the constitutionality of the *qui tam* provisions of the False Claims Act is upheld.

The constitutional question is a troubling one for me. I am somewhat dubious, however, about General Electric's standing to raise this question in an appeal from an attorney fee award that followed settlement and dismissal of the case in chief. I do not believe "that a pending claim for attorneys' fees, standing alone, could require (or entitle) a federal court to adjudicate the merits of a dispute which in other respects was no longer live." *Friends of Keeseville, Inc. v. F.E.R.C.,* 859 F.2d 230, 233 n. 7 (D.C.Cir. 1988).

It is true, as General Electric points out in response to the relators' argument on this issue, that on March 16, 1992, the United States itself filed an amended complaint in the action. This the United States unquestionably had a right to do. It is also true, however, that on April 28, 1992—subsequent to the filing of the government's amended complaint—General Electric moved to dismiss the action for lack of subject matter jurisdiction, without prejudice to reinstitution by the United States. One of the reasons for dismissal advanced in General Electric's motion was this:

> "The qui tam provisions of the False Claims Act are unconstitutional. By allowing relators to institute claims on behalf of the United States, the statute impermissibly interferes with the Executive Branch's duty to prosecute claims on behalf of the United States and therefore violates the Constitution's principle of separation of powers. Furthermore, by allowing relators to conduct litigation on behalf of the United States as executive "officers" although they have not been appointed by the President, a court, or a head of a department, the statute violates the Appointments Clause of the Constitution. U.S. Const. art. II, § 2, cl. 2."

The April 28 motion to dismiss was still pending on July 23, 1992, when, pursuant to a settlement agreement, the district court entered its order dismissing the case with prejudice. The dismissal probably rendered the constitutional question moot, and I doubt that we ought to decide it now.